UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

| | | |
|---|---|---|
| JOHN THOMAS MOORE ROLLOVER IRA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SOLARWINDS, INC., THOMA BRAVO, SILVER LAKE PARTNERS, PROJECT AURORA HOLDINGS, LLC, PROJECT AURORA MERGER CORP., KEVIN B. THOMPSON, STEVEN M. CAKEBREAD, PAUL J. CORMIER, ELLEN F. SIMINOFF, ROGER J. SIPPL and LLOYD G. WATERHOUSE,<br><br>Defendants. | § § § § § § § § § § § § § § § § § § § § § | Civil Action No. __1:15-cv-01228__<br><br><br><br><br>CLASS ACTION<br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

**COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND
VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff, by counsel, individually and on behalf of all others similarly situated, respectfully

brings this class action for breach of fiduciary duty and violations of §§14(a) and 20(a) of the

Securities Exchange Act of 1934 (the "1934 Act") and U.S. Securities and Exchange Commission

("SEC") Rule 14a-9 promulgated thereunder against the herein named defendants and alleges the

following:

## NATURE OF THE ACTION

1.      This is a stockholder class action on behalf of the public stockholders of SolarWinds, Inc. ("SolarWinds" or the "Company") against SolarWinds, the members of SolarWinds' Board of Directors (the "Board"), Thoma Bravo, Silver Lake Partners ("Silver Lake"), Project Aurora Holdings, LLC ("Parent"), and Project Aurora Merger Corp., a wholly owned subsidiary of Parent ("Merger Sub") (Merger Sub and Parent were formed by affiliates of Thoma Bravo and Silver Lake, and all four are referred to collectively herein as "Sponsors"), for breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty and/or other violations of law in connection with defendants' efforts to complete the sale of SolarWinds to Sponsors (the "Proposed Acquisition").  The Proposed Acquisition is the result of an unfair and improper process, which, in turn, has resulted in an unfair price for SolarWinds stockholders.  This matter arises out of defendants' dissemination of a false and misleading proxy statement in violation of §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, and the Board's breaches of their fiduciary duties owed to the Company's stockholders under state law.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over all claims asserted herein pursuant to §27 of the 1934 Act for violations of §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  The Court also has jurisdiction over this action pursuant to 15 U.S.C. §78bb(f)(3)(A)(i), because it is a class action based on the statutory or common law of Delaware, defendant SolarWinds' state of incorporation, and thus may be maintained in federal court.  This Court has supplemental jurisdiction under 28 U.S.C. §1367.

3.      Venue is proper in this District because SolarWinds has its principal place of business in this District.  Plaintiff's claims arose in this District, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists, and

where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court.  Moreover, each of the Individual Defendants (as defined below), as Company officers and/or directors, has extensive contacts with this District.

**PARTIES**

4.      Plaintiff John Thomas Moore Rollover IRA is, and at all times relevant hereto was, a stockholder of SolarWinds.

5.      Defendant SolarWinds is a publicly traded Delaware corporation with headquarters at 7171 Southwest Parkway, Building 400, Austin, Texas.  SolarWinds is sued herein as an aider and abettor.

6.      Defendant Thoma Bravo is one of the most active and successful private equity firms in the software industry.  Thoma Bravo typically invests in companies with revenues between $50 million and $500 million.  Thoma Bravo is sued herein as an aider and abettor.

7.      Defendant Silver Lake is a limited partnership organized under the laws of the State of Delaware, maintaining its principal place of business at 2775 Sand Hill Road, Menlo Park, California. The partnership is a private equity firm focused on large-scale investments in technology and related industries.  Silver Lake is sued herein as an aider and abettor.

8.      Defendant Parent is a Delaware limited liability company, and was formed by affiliates of Thoma Bravo and Silver Lake.  Parent is sued herein as an aider and abettor

9.      Defendant Merger Sub is a Delaware corporation and wholly owned subsidiary of Parent.  Merger Sub was formed by affiliates of Thoma Bravo and Silver Lake.  Merger Sub is sued herein as an aider and abettor.

10.      Defendant Kevin B. Thompson ("Thompson") is, and at all times relevant hereto was, SolarWinds' President and Chief Executive Officer ("CEO"), and a director of SolarWinds.

11.    Defendant Steven M. Cakebread is, and at all times relevant hereto was, a director of SolarWinds.

12.    Defendant Paul J. Cormier is, and at all times relevant hereto was, a director of SolarWinds.

13.    Defendant Ellen F. Siminoff is, and at all times relevant hereto was, a director of SolarWinds.

14.    Defendant Roger J. Sippl is, and at all times relevant hereto was, a director of SolarWinds.

15.    Defendant Lloyd G. Waterhouse is, and at all times relevant hereto was, a director of SolarWinds.

16.    The defendants named above in ¶¶10-15 are sometimes collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

17.    Plaintiff's claims are brought on plaintiff's own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all public holders of SolarWinds stock who are being and will be harmed by defendants' actions described below (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendants.

18.    The fiduciary duty and aiding and abetting claims are properly maintainable as a class action under Federal Rule of Civil Procedure 23.

19.    The Class is so numerous that joinder of all members is impracticable. According to the Merger Agreement, there are more than 71.7 million shares of SolarWinds common stock issued and outstanding.

20.     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

(a)     whether defendants have breached their fiduciary duties of undivided loyalty, independence, or due care with respect to plaintiff and the other members of the Class in connection with the Proposed Acquisition, and/or are aiding and abetting therein;

(b)     whether defendants are engaging in self-dealing in connection with the Proposed Acquisition, and/or are aiding and abetting therein;

(c)     whether defendants have breached their fiduciary duty to secure and obtain the best value reasonable under the circumstances for the benefit of plaintiff and the other members of the Class in connection with the Proposed Acquisition, and/or are aiding and abetting therein;

(d)     whether defendants are unjustly enriching themselves and other insiders or affiliates of Sponsors, and/or are aiding and abetting therein;

(e)     whether defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Proposed Acquisition, including the duties of good faith, diligence, candor and fair dealing, and/or are aiding and abetting therein;

(f)     whether defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets, and/or have aided and abetted therein;

(g)     whether the Proposed Acquisition compensation payable to plaintiff and the Class is unfair and inadequate; and

(h)     whether plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

21.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

22.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

23.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

24.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

25.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

### DEFENDANTS' FIDUCIARY DUTIES

26.     Under applicable law, in any situation where the directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control; or (ii) a break-up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.  To diligently comply with these duties, the directors and/or officers may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits themselves from complying with their fiduciary duties;

(d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

27.     In accordance with their duties of loyalty and good faith, the defendants, as directors and/or officers of SolarWinds, are obligated under applicable law to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties are divided;

(b)     participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

28.     Plaintiff alleges herein that defendants, separately and together, in connection with the Proposed Acquisition, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith and independence owed to plaintiff and other public shareholders of SolarWinds.

29.     Because defendants are knowingly or recklessly breaching their duties of loyalty, good faith and independence in connection with the Proposed Acquisition, the burden of proving the

inherent or entire fairness of the Proposed Acquisition, including all aspects of its negotiation, structure, price and terms, is placed upon defendants as a matter of law.

## THE PROPOSED ACQUISITION

**Background**

30.    SolarWinds was started in Tulsa, Oklahoma, and was founded by Donald Yonce and David Yonce. The Company provides powerful and affordable hybrid IT infrastructure management software to customers worldwide from Fortune 500® enterprises to small businesses, government agencies and educational institutions. SolarWinds focuses on IT professionals, and strives to eliminate the complexity that they have been forced to accept from traditional enterprise software vendors. SolarWinds delivers products that are easy to find, buy, use, maintain, and scale while providing the power to address all key areas of the IT infrastructure.

**The Company's Ongoing and Growing Success**

31.    SolarWinds, with over 1,500 employees and 150,000 customers worldwide, has enjoyed tremendous, sustained 25% year-over-year growth over the past years. For example, for fiscal 2013, the Company reported 25% year-over-year revenue growth.

32.    On January 29, 2015, SolarWinds reported results for its fourth quarter and full year ended December 31, 2014. Total revenue for the fourth quarter reached a record high of $118.4 million, representing 22% year-over-year growth on a reported basis and 24% year-over-year growth on a constant currency basis. For the full 2014 fiscal year, the Company reported record revenues of $429 million, a year-over-year increase of 27.8%. Other financial highlights included:

- Combined maintenance and subscription revenue for the fourth quarter of $73.4 million, representing 28% year-over-year growth in recurring revenue.

- License revenue for the fourth quarter of $45.1 million, representing 14% year-over-year growth.

*      *      *

On a GAAP basis, diluted earnings per share were $0.30 for the fourth quarter of 2014, compared to $0.28 for the fourth quarter of 2013. Non-GAAP diluted earnings per share were $0.51 for the fourth quarter of 2014 compared to $0.41 for the fourth quarter of 2013.

33.     In its January 29, 2015 press release, SolarWinds also reported the following accomplishments:

- SolarWinds acquired Librato®, a Cloud-based monitoring company headquartered in San Francisco. This latest acquisition, on the heels of SolarWinds' acquisition of Pingdom® in 2014, represents another step in the company's efforts to extend and connect performance management capabilities from on-premise IT infrastructure to Cloud-based application environments. The company believes that these two acquisitions represent significant progress towards executing an overall vision of helping technology pros manage all things IT in a hybrid world.

- The Company's results in 2014 reflect strength across multiple product lines, including contributions to year-over-year growth for the Network Management and Database Management product portfolios. The SolarWinds MSP team also drove solid performance and delivered record results.

- In the fourth quarter, SolarWinds released an updated version of SolarWinds® Database Performance Analyzer (DPA), giving database administrators valuable insight into the database's impact on other layers of the application stack. SolarWinds DPA 9.0 adds storage resource visibility and correlation, providing database admins with unique insight into how storage I/O issues contribute to poor response time; and adds metric baselining and alerting, which enables DBAs to pinpoint the root cause of performance issues within minutes.

- SolarWinds continues to receive honors for its business and product performance. In the fourth quarter, SolarWinds' GeekSpeak blog, which offers IT Professionals deep, technical discussions on a range of IT management topics, was named one of BizTech's 50 Must-Read IT blogs of 2014. Fourth quarter product accolades included a number of awards across multiple publications for Server & Application Monitor (SAM), Virtualization Manager (VM), Network Performance Monitor (NPM), Network Configuration Manager (NCM), User Device Tracker (UDT), Network Topology Mapper (NTM), Log & Event Manager (LEM) and SolarWinds N-able's N-central®.

34.     In commenting on these results and accomplishments, SolarWinds President and CEO defendant Thompson remarked:

"I am pleased to report that we delivered another strong performance in the fourth quarter, and closed the year in a very good position.  Over the course of the year, we invested heavily in our business and believe that those investments have translated into strong gains across product lines and the regions in which we operate . . . ."

"The team is continuously working to enhance our execution and this will remain a focus in 2015 – both as we continue to capitalize on the opportunity in the on-premise IT Management market and as we expand SolarWinds' offerings and model into technology management for the Cloud.  We believe that we have created momentum in the business that will allow us to take advantage of new opportunities in 2015 . . . ."

35.     SolarWinds Chief Financial Officer ("CFO"), Jason Ream ("Ream"), also made comments about the Company's results, accomplishments and prospects in the January 29, 2015 press release:

"Through the hard work of the SolarWinds team and the increased investment we made in our business this year, we exited 2014 well-positioned to capitalize on the opportunity in IT management . . . .  Despite foreign currency headwinds which negatively impacted our year-over-year revenue growth, our fourth quarter revenue growth remained robust and represents record total revenue for SolarWinds."

"In addition, though we continued to aggressively invest in our business, the inherent leverage in our business model was once again reflected in non-GAAP operating margins well above our outlook.  For the coming year, we remain confident in our ability to drive strong growth despite continued foreign currency headwinds as we continue to focus on improving our momentum in network and systems management while extending our capabilities beyond on-premise IT management in order to attack the growing opportunity to manage the performance of applications and IT infrastructure both in the Cloud as well as across hybrid on-premise/Cloud environments . . . ."

36.     Finally, the Company also provided guidance in the January 29, 2015 press release:

SolarWinds' management currently expects to achieve *the following results for the first quarter of 2015*:

- Total revenue in the range of $116.2 to $118.4 million, or *21% to 23% growth over the first quarter of 2014*.

\*          \*          \*

- Non-GAAP diluted earnings per share of $0.43 to $0.46.

- 10 -

37.     On April 28, 2015, SolarWinds announced its results from operations for its first quarter of fiscal 2015 ended March 31, 2015.  Not only did the Company meet its January 29, 2015 guidance, but it also reported:

- Combined maintenance and subscription revenue for the first quarter of $74.4 million, representing 25% year-over-year growth in recurring revenue on a reported basis and 31% on a constant currency basis.

- License revenue for the first quarter of $42.4 million, representing 17% year-over-year growth on a reported basis and 19% on a constant currency basis.

\*       \*       \*

On a GAAP basis, diluted earnings per share were $0.24 for the first quarter of 2015 compared to $0.23 for the first quarter of 2014.  Non-GAAP diluted earnings per share were $0.46 for the first quarter of 2015, compared to $0.41 for the first quarter of 2014.

38.     In its April 28, 2015 press release SolarWinds also reported the following business highlights:

- The company continued to strengthen the new SolarWinds® Cloud brand through the acquisition of Papertrail, a Cloud-based log management company, and the launch of a new user interface, Spaces, for the Librato® Cloud monitoring solution.  Papertrail extends the company's ability to help IT Pros, DevOps and developers quickly and easily monitor log data in order to troubleshoot application performance across on-premise, SaaS and Cloud-based environments like Amazon Web Services (AWS®).  Librato's user interface Spaces offers cloud developers and operations teams the ability to create and manipulate interactive dashboards of time series data and composite metrics for faster collaboration and problem resolution.

- SolarWinds also enhanced their systems management product offerings to help IT organizations ensure optimal application performance by monitoring the complete application stack (AppStack) through a single pane of glass. Specifically, the company introduced the new SolarWinds Storage Resource Monitor (SRM) and released significant updates to SolarWinds Server & Application Monitor (SAM), SolarWinds Virtualization Manager and SolarWinds Web Performance Monitor (WPM), including greater integration with SolarWinds' Orion® technology backbone and the new SolarWinds AppStack dashboard.

- SolarWinds continues to receive honors for its business and product performance.  In the first quarter, SolarWinds' Europe, the Middle East and

Africa (EMEA) Headquarters located in Cork, Ireland, was named Cork Company of the Year and also received the Large Company of the Year Award as part of the 2015 Cork Company of the Year Awards sponsored by the Cork Chamber. In addition, the U.K.'s Network Computing Magazine recognized SolarWinds as a finalist for Company of the Year. First quarter product accolades included a number of awards across multiple publications for SolarWinds Server & Application Monitor (SAM), SolarWinds Virtualization Manager (VM), SolarWinds Network Performance Monitor (NPM), SolarWinds Network Configuration Manager (NCM), and SolarWinds Log & Event Manager (LEM).

39.   In commenting on these results and accomplishments, SolarWinds President and CEO defendant Thompson remarked:

"The first quarter was a solid start to 2015. We drove strong growth in our core network and systems management products, and in our MSP business, which contributed to healthy overall new business sales growth. We also continued to execute on our goal of becoming the IT management vendor of choice for addressing the complex, connected set of performance problems in today's increasingly hybrid IT infrastructures by acquiring a Cloud-based log management company. We are excited about the numerous opportunities for growth that we believe lie ahead of us . . . ."

40.   SolarWinds CFO Ream also made comments about the Company's results, accomplishments and prospects in the April 28, 2015 press release:

"We are pleased with our first quarter revenue growth of 27% on a constant currency basis. We believe these results illustrate the strength of our hybrid financial model, highlighted by a growing mix of predictable, recurring revenue, which grew 31% on a constant currency basis . . . ."

"In addition, despite the increased level of investment we have made in our business and in our hybrid IT management software strategy, the inherent leverage in our business model was once again reflected in non-GAAP operating margins that exceeded our outlook for the first quarter . . . ."

41.   Finally, the Company provided the following guidance in the April 28, 2015 press release:

SolarWinds' management currently expects to achieve the following results for the second quarter of 2015:

- Total revenue on a reported basis in the range of $120.6 to $123.8 million, or 19% to 22% growth over the second quarter of 2014. Total revenue on a

constant currency basis in the range of $127.0 to $130.0 million, or 25% to 28% growth over the second quarter of 2014.

\* \* \*

- Non-GAAP diluted earnings per share of $0.45 to $0.47.

\* \* \*

SolarWinds' management currently expects to achieve the following results for the full year 2015:

- Total 2015 revenue on a reported basis in the range of $512.0 to $527.0 million, or 19% to 23% year-over-year growth.  Total revenue on a constant currency basis in the range of $530.0 to $544.0 million, or 24% to 27% year-over-year growth.

\* \* \*

- Non-GAAP diluted earnings per share of $1.92 to $2.04.

42.   Most recently, on July 16, 2015, SolarWinds reported its financial results from operations for the period ended June 30, 2015.  These include:

- Total revenue for the second quarter of $119.1 million on a reported basis and $125.0 million on a constant currency basis, representing 17% year-over-year growth on a reported basis and 23% year-over-year growth on a constant currency basis.

- *Record* recurring revenue for the second quarter of $80.5 million on a reported basis, comprising maintenance revenue of $67.6 million and subscription revenue of $12.9 million, and $85.3 million on a constant currency basis, representing 26% year-over-year growth on a reported basis and 34% year-over-year growth on a constant currency basis, and representing 68% of total revenue.

- License revenue for the second quarter of $38.6 million on a reported basis and $39.6 million on a constant currency basis, representing 3% year-over-year growth on a reported basis and 5% year-over-year growth on a constant currency basis.

- GAAP operating income of $27.9 million and GAAP operating margin of 24% for the second quarter of 2015 compared to GAAP operating income of $18.2 million and GAAP operating margin of 18% for the second quarter of 2014.

- Non-GAAP operating income of $51.5 million and non-GAAP operating margin of 43% for the second quarter of 2015 compared to non-GAAP operating income of $42.7 million and non-GAAP operating margin of 42% for the second quarter of 2014.

- **Record** cash flow from operations of $54.7 million in the second quarter of 2015 compared to $51.0 million in the second quarter of 2014.

- GAAP diluted earnings per share of $0.29 for the second quarter of 2015 compared to $0.18 for the second quarter of 2014 and non-GAAP diluted earnings per share of $0.52 for the second quarter of 2015 compared to $0.41 for the second quarter of 2014.

43.    In its July 16, 2015 press release SolarWinds also reported the following business highlights:

- The company took important steps to strengthen its ability to reach IT pros and provide them with the best products to manage all things IT – from on-premise to the Cloud – regardless of where the asset or user sits. SolarWinds added a new strategic European R&D office in Kraków, Poland, expanded a dedicated international sales team to better serve national government IT pros and added Jason Marshall as Senior Vice President, Chief Marketing Officer.

- SolarWinds also delivered important product updates.  Among these enhancements, SolarWinds® Virtualization Manager now provides users the ability to perform remediation actions for performance issues in virtualized environments; SolarWinds Storage Resource Monitor added support for five market-leading storage array families; SolarWinds Network Configuration Manager now automates network vulnerability detection and security policy enforcement with remediation actions; and SolarWinds Database Performance Analyzer improved the performance management of business-critical applications whether hosted on premises, in a virtualized environment or on the Amazon Web Services® Cloud as well as introduced new integration with SolarWinds' Orion® technology backbone, providing a single view of performance, uptime, capacity and resource utilization across the stack. Additional product updates were made to SolarWinds Web Help Desk® software and DameWare® Remote Support.

- SolarWinds and its products received recognition from several leading IT and business publications.  SolarWinds systems management family of products won for overall "Application Performance Monitoring & Management" in NetworkWorld® Asia's Information Management Awards. SC Magazine® honored SolarWinds Network Configuration Manager with "Best Risk/Policy Management Solution" and "Best SIEM Solution" for SolarWinds Log & Event Manager.  In addition, Database Trends and Applications included SolarWinds on their DBTA 100 2015 list based on SolarWinds' database

- 14 -

performance management and optimization capabilities.  Forbes® also recently ranked SolarWinds No. 19 on its list of the "Most Innovative Growth Companies."

44.    In commenting on these results and accomplishments, SolarWinds President and

CEO defendant Thompson remarked:

> "During the second quarter of 2015 several areas of our business performed well including our MSP and Cloud businesses, license sales in our US Federal and Asia-Pacific businesses, our installed base teams' sales efforts and our customer retention rates.  In addition, we exceeded our margin and profit outlook and generated record cash flow from operations given the strength of our unique business model . . . ."

> "As we look ahead to the second half of 2015, we feel confident in our ability to deliver strong growth given the size of our market opportunity and our strategy to capitalize on it as we seek to become the IT management vendor of choice for managing all things IT for IT professionals in all geographies and in companies of all sizes . . . ."

45.    SolarWinds CFO Ream also made comments about the Company's results,

accomplishments and prospects in the July 16, 2015 press release:

> "Our focus on delighting our customers resulted in strong customer retention rates for maintenance and subscription in the quarter . . . .  In addition, our highly efficient business model allowed us to deliver ***a very strong quarter of earnings and cash flow*** in the second quarter."

46.    Finally, the Company provided the following guidance in the July 16, 2015 press

release:

> SolarWinds' management currently expects to achieve the following results for the third quarter of 2015:

- Total revenue on a reported basis in the range of $130 to $134 million, or 15% to 19% growth over the third quarter of 2014.  Total revenue on a constant currency basis in the range of $135 to $138 million, or 19% to 23% growth over the third quarter of 2014.

> *        *        *

- Non-GAAP diluted earnings per share of $0.49 to $0.53.

> *        *        *

- 15 -

SolarWinds' management currently expects to achieve the following results for the full year 2015:

- Total 2015 revenue on a reported basis in the range of $502 to $512 million, or 17% to 19% year-over-year growth.  Total revenue on a constant currency basis in the range of $521 to $530 million, or 22% to 24% year-over-year growth.

\*       \*       \*

- Non-GAAP diluted earnings per share of $2.00 to $2.08.

**The Proposed Acquisition Is Announced**

47.     Despite the Company's consistent and stable revenue and earnings growth, its repeated record-breaking cash flow, its highly efficient business model, its solid start to 2015, SolarWinds' numerous growth opportunities ahead, and the Board and management's confidence in its ability to deliver strong growth, the Board decided to sell the Company rather than pursue its excellent prospects as a standalone business.

48.     On October 9, 2015, SolarWinds announced in a press release that it was reviewing its strategic alternatives.  In pertinent part, the press release states:

SolarWinds, Inc. (the "Company") today announced that the Company's board of directors, in response to an unsolicited expression of interest from a third party, has commenced a review of its strategic alternatives. This review may result in the Company's continuing to pursue value-enhancing initiatives as a standalone company or a possible sale or other form of business combination. The Board of Directors has retained J.P. Morgan as its financial advisor and DLA Piper LLP (US) as its legal advisor in connection with the review.

"Consistent with its duties, our board of directors has determined that it is prudent to undertake a review to see which alternative or alternatives, including our standalone plan, are the best way to maximize shareholder value," said Kevin Thompson, the Company's Chief Executive Officer. "As the board conducts its review, we remain focused on strong revenue growth and cash flow and excited about continuing to deliver our world class products to help IT professionals manage all things IT."

No decision has been made to enter into any transaction at this time, and there can be no assurance that the consideration of strategic alternatives will result in any transaction.

There is no set timetable with respect to the board's review, and the Company does not expect to make further public comment regarding these matters unless and until the Board approves a specific action or otherwise concludes its review.

49.     Just twelve days later, on October 21, 2015, SolarWinds and Sponsors announced that they had entered into a definitive agreement (the "Merger Agreement"), pursuant to which Sponsors will acquire SolarWinds for just $60.10 per share in cash for each existing SolarWinds share. Following the consummation of the Proposed Acquisition, Merger Sub will be merged with and into the Company (the "Merger"), with the Company surviving the Merger as a wholly owned subsidiary of Parent.

50.     The press release announcing the Proposed Acquisition states in pertinent part:

### SolarWinds to Be Acquired by Silver Lake and Thoma Bravo in a Transaction Valued at $60.10 Per Share and Total Equity Value of $4.5 Billion

. . SolarWinds, a leading provider of powerful and affordable IT management software, today announced that it has entered into a definitive agreement to be acquired by leading private equity technology investment firms Silver Lake Partners and Thoma Bravo, LLC. Under the terms of the agreement, SolarWinds stockholders will receive $60.10 per share or approximately $4.5 billion in cash. The agreement was approved by SolarWinds' Board of Directors following a comprehensive review of strategic alternatives.

"This transaction recognizes the strength of our unique business model and provides our shareholders with immediate and substantial cash value at a compelling premium," said Kevin B. Thompson, President and Chief Executive Officer of SolarWinds. "We remain committed to our customers and to delivering world class products to help IT professionals manage all things IT in today's increasingly performance-driven IT infrastructures. Becoming a private company will provide SolarWinds with optimal operating flexibility to execute on its long-term strategy of providing superior products for IT and Dev Ops Pros all over the world. We are extremely excited about partnering with Silver Lake and Thoma Bravo in the next chapter of the SolarWinds story."

"The Board of Directors evaluated a wide variety of strategic," said Buzz Waterhouse, a member of the Board of Directors of SolarWinds. "Ultimately, the Board concluded that Silver Lake and Thoma Bravo's offer to acquire SolarWinds is the best way to maximize value for our stockholders."

"SolarWinds is an exceptional franchise, empowering IT professionals to solve a broad range of challenges every day," said Ken Hao and Mike Bingle, Managing Partners at Silver Lake.  "We have been impressed by the SolarWinds team and their strong track record of growth.  We see significant potential to extend and grow the SolarWinds franchise as a private company."

"Thoma Bravo is excited to partner with the SolarWinds' management team to propel the Company into its next stage of growth," said Orlando Bravo, a managing partner at Thoma Bravo.  "We look forward to building upon SolarWinds' existing market leadership in network performance monitoring while also accelerating its current growth initiatives in Cloud, Hybrid and MSP environments," added Seth Boro, a managing partner at Thoma Bravo.

The purchase price represents a 43.5 percent premium to the closing price of SolarWinds common stock on October 8, 2015, one day prior to SolarWinds' announcement that it was exploring strategic alternatives.

The transaction, which is expected to close in the first calendar quarter of 2016, is subject to approval by SolarWinds stockholders, regulatory approvals and other customary closing conditions.

J.P. Morgan Securities LLC is serving as financial advisor, and DLA Piper LLP (US) is serving as legal advisor to SolarWinds.  Kirkland & Ellis LLP is serving as legal advisor to Thoma Bravo and Ropes & Gray LLP is serving as legal advisor to Silver Lake.

**Disabling Conflicts Infect the Process**

51.     The process leading to the Proposed Acquisition was infected with conflicts.  The Proposed Acquisition is the product of a hopelessly flawed process that is designed to ensure the sale of SolarWinds to Sponsors on terms preferential to defendants and other SolarWinds insiders and to subvert the interests of plaintiff and the other public stockholders of the Company.

52.     The Proposed Acquisition is being driven by the members of the Board and Company management.  The Board and Company management collectively own a large illiquid block of over 11 million SolarWinds shares, or approximately 14.6% of the total outstanding shares, and seek liquidity for their illiquid holdings.  The Proposed Acquisition offers that liquidity.  If the Proposed Acquisition closes, the members of the Board and Company management will receive **_over $670 million_** from the deal.

53.     SolarWinds' officers and directors will receive millions of dollars in special benefits – not being made to ordinary stockholders – for currently unvested stock options, performance units and restricted shares, all of which shall, upon the Merger's closing, become fully vested and exercisable.  The Company's senior management is also entitled to receive from the Proposed Acquisition over $67 million more in change-of-control payments.  Thus, the Board is conflicted and serving its own financial interests rather than those of SolarWinds' other stockholders.

54.     Moreover, while SolarWinds' stockholders are being cut out of the picture, in addition to "cashing in" their illiquid holdings, the Company's management appears to be staying on board after the transaction.  The press release announcing the Proposed Acquisition admits as much: "'Thoma Bravo is excited to partner with the SolarWinds' management team to propel the Company into its next stage of growth.'"  Consequently, in being retained by Sponsors, SolarWinds' management gets the best of both worlds: they can cash in their equity holdings, but also remain in their current positions without being subject to the hassles and filing requirements of running a publicly traded company.  In other words, the Proposed Acquisition is essentially a management buyout, backed by Sponsors.

55.     Finally the Board selected a conflicted financial advisor.  For services rendered in connection with the proposed Merger and the delivery of its opinion, the Board agreed to pay J.P. Morgan Securities LLC ("J.P. Morgan") a transaction fee of 0.875% of the total consideration to be paid to the holders of Company common stock, $3.5 million of which was payable upon the earlier of the public announcement of the Proposed Acquisition or delivery by J.P. Morgan of its opinion. The total amount of J.P.Morgan's fee has not been disclosed, but if the total amount of cash to be paid to SolarWinds' shareholders is approximately $4.5 billion (per the press release announcing the Proposed Acquisition), then the J.P. Morgan's fee for serving as the Board's financial advisor is

approximately $39.5 million, $36 million of which is ***wholly contingent*** on the successful closing of the Proposed Acquisition.

**The Conflicted and Unfair Process Led to an Unfair Price**

56.     The Board is obligated by fiduciary duty to maximize the value received by SolarWinds stockholders in a change-of-control transaction.  That maximized value must reflect SolarWinds' financial performance and prospects.  But the Board agreed to sell SolarWinds to Sponsors, at hardly a maximized value that does not reflect SolarWinds' financial performance and prospects. Instead, SolarWinds' Board agreed to a "going-private" deal that cashes out stockholders at a discount with no opportunity to reap the benefits of any future growth.  Interestingly, current management and employees will remain with Sponsors, which would have been less likely with a strategic acquirer.

57.     The Proposed Acquisition consideration of $60.10 per share fails to fully value the Company's prospects.  Specifically, the Proposed Acquisition consideration does not reflect, *inter alia*, the Company's consistent and stable revenue and earnings growth, its highly efficient business model, its solid start to 2015, its projected 2015 20% year-over-year revenue growth, SolarWinds' numerous growth opportunities ahead, and the Board and management's confidence in its ability to deliver strong growth.

58.     Moreover, following the announcement of the Proposed Acquisition, on October 29, 2015, SolarWinds announced its financial results from operations for its third quarter of fiscal 2015 (ended September 30, 2015).  For the third quarter, the Company reported the following financial highlights:

- Total revenue for the third quarter of $131.6 million on a reported basis and $136.9 million on a constant currency basis, representing 17% year-over-year growth on a reported basis and 21% year-over-year growth on a constant currency basis.

- Record recurring revenue for the third quarter of $86.3 million on a reported basis, comprising maintenance revenue of $71.5 million and subscription revenue of $14.8 million, and $90.8 million on a constant currency basis, representing 23% year-over-year growth on a reported basis and 30% year-over-year growth on a constant currency basis, and representing 66% of total revenue.

- License revenue for the third quarter of $45.3 million on a reported basis and $46.1 million on a constant currency basis, representing 6% year-over-year growth on a reported basis and 8% year-over-year growth on a constant currency basis.

- GAAP operating income of $36.5 million and GAAP operating margin of 28% for the third quarter of 2015 compared to GAAP operating income of $31.7 million and GAAP operating margin of 28% for the third quarter of 2014.

- Non-GAAP operating income of $57.9 million and non-GAAP operating margin of 44% for the third quarter of 2015 compared to non-GAAP operating income of $51.0 million and non-GAAP operating margin of 45% for the third quarter of 2014.

- Record cash flow from operations of $57.9 million in the third quarter of 2015 compared to $54.3 million in the third quarter of 2014.

- GAAP diluted earnings per share of $0.36 for the third quarter of 2015 compared to $0.32 for the third quarter of 2014 and non-GAAP diluted earnings per share of $0.57 for the third quarter of 2015 compared to $0.50 for the third quarter of 2014.

59.    In its October 29, 2015, press release, SolarWinds also reported the following additional highlights:

- SolarWinds introduced a number of new product enhancements that added depth and breadth across its portfolio of Network and Systems Management and Cloud products and also announced exciting new product releases within its MSP business:

  - SolarWinds N-able announced the release of MSP Anywhere, which adds a new cloud-based remote control access and support platform that provides managed service providers (MSPs) with instant and on-demand remote support and access to Windows® PCs and Mac®, as well as iOS® and Android®-based mobile devices from virtually any device. MSP Anywhere was acquired as part of the company's recent purchase of BeAnywhere®.

- SolarWinds N-able also introduced MSP Manager, which adds a cloud-based IT service management platform that provides small to medium-sized MSPs to run a more efficient, effective and profitable IT service organization. MSP Manager was acquired as part of the company's recent purchase of Capzure®.

- SolarWinds released Database Performance Analyzer 10.0, extending support to MySQL®. With the addition of MySQL, SolarWinds® DPA now supports the top three database platforms – Microsoft® SQL Server®, Oracle® and MySQL – plus more, thereby providing database administrators (DBAs), application developers and operations teams with enterprise-grade database performance tuning, metric visibility and resource correlation based on a unique wait-time-analytics and resource correlation approach to help improve the performance of corporate, cloud and SaaS applications based on any of these databases from within a single management dashboard.

- SolarWinds Storage Resource Monitor, which provides IT with the necessary insight into storage resources and the potential performance impact on virtual machines and applications that are dependent on storage elements, added support for additional EMC®, Hitachi®, HP® and IBM® storage array families and now provides monitoring capabilities for hierarchical storage pools.

- SolarWinds Log & Event Manager, a powerful security information and event management (SIEM) product designed for resource-constrained IT organizations, introduced the addition of a threat intelligence feed to help IT security pros identify known, proven threats and limit the impact of cyber-attacks.

- SolarWinds' Librato® real-time cloud monitoring solution added a new turnkey integration for Docker, providing Librato's developer and devops users with the ability to monitor and visualize application performance inside of Docker containers. Docker joins Librato's list of more than 90 collection agents and language bindings, including Amazon CloudWatchTM and Heroku®. Other new turnkey integrations provide monitoring for NGINX® web servers and RedisTM servers as well as performance insight into Ruby on Rails® and Rack application stacks.

- SolarWinds IT management products received recognition from Redmond magazine's 2015 Reader's Choice Awards in 12 different categories, including network, systems and application, database, security, and remote monitoring management. Most notably, SolarWinds Network Management Software, Network Performance Monitor, Server & Application Monitor, and NetFlow Traffic Analyzer were distinguished with the Platinum award. In addition, SolarWinds N-able ranked among the world's Top 100 Cloud

Service Providers (CSPs), according to Penton's fifth- annual Talkin'
Cloud® 100 report.

60.     Furthermore, the Proposed Acquisition consideration does not reflect SolarWinds'
value to Sponsors.  For example, former Board member Benjamin Nye, managing director of
Boston-based Bain Capital Ventures, an early SolarWinds investor, said last week he was not
surprised about the buyout news.  "I think it's a very vibrant, healthy company," he said. "I think
they'll continue to grow it."  Nye said he expects SolarWinds to complete another public offering in
the future.  Moreover, Sponsors gain access to SolarWinds' record-breaking cash flow.

61.     In short, SolarWinds' prospects are excellent and growing.  But rather than pursue the
Company's current strategy, with its strong prospects, the Board agreed, for its own interests, to sell
SolarWinds on the cheap, ignoring its duty to maximize stockholder value.

**Preclusive Deal Protection Devices**

62.     In addition, defendants agreed to certain onerous and preclusive deal protection
devices that operate conjunctively to make the Proposed Acquisition a *fait accompli* and ensure that
no competing offers will emerge for the Company.

63.     To protect against the threat of alternate bidders out-bidding Sponsors after the
announcement of the Proposed Acquisition, defendants implemented preclusive deal protection
devices to guarantee that Sponsors will not lose their preferred position.  These deal protection
devices effectively preclude any competing bids for SolarWinds.

64.     The Merger Agreement includes a "no solicitation" provision barring the Company
from soliciting interest from other potential acquirers in order to procure a price in excess of the
amount offered by Sponsors.

65.     Pursuant to the Merger Agreement, in the event an unsolicited bidder submits a
competing proposal, the Company must notify Sponsors of the bidder's identity and the terms of the

bidder's offer.  Thereafter, should the Board determine that the unsolicited offer is superior, before the Company can terminate the Merger Agreement with Sponsors in order to enter into the competing proposal, it must negotiate in good faith with Sponsors (if Sponsors so desire) and allow Sponsors to amend the terms of the Merger Agreement to make a counter-offer that SolarWinds must consider in determining whether the competing bid still constitutes a superior proposal.

66.     In addition, the Merger Agreement grants Sponsors information rights that require SolarWinds to share highly sensitive information about competing proposals with Sponsors.  In other words, the Merger Agreement gives Sponsors access to any rival bidder's information and allows Sponsors a free right to top any superior offer simply by matching it.  Accordingly, no rival bidder is likely to emerge and act as a stalking horse because the Merger Agreement unfairly assures that any "auction" will favor Sponsors and piggy-back upon the due diligence of the foreclosed second bidder.

67.     Finally, the Merger Agreement provides that SolarWinds must pay Sponsors a ***$159 million termination fee*** if the Company decides to pursue a competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the Company's stockholders with a superior offer.

68.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

**The False and Misleading Proxy**

69.     To make matters worse, and in an attempt to secure shareholder support for the unfair Proposed Acquisition, on November 17, 2015, defendants caused SolarWinds to file a Preliminary Proxy Statement on Form 14A, and on December 15, 2015, a Definitive Proxy Statement on Form 14A (collectively, the "Proxy").  The Proxy, which recommends that SolarWinds shareholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information about the unfair sales process for the Company, conflicts of interest that corrupted the sales process, the unfair consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Company on a stand-alone basis and as acquired by the Sponsors.   Specifically, the Proxy omits and/or misrepresents the material information set forth below, in contravention of §§14(a) and 20(a) of the 1934 Act and/or defendants' fiduciary duty of disclosure under state law.

70.     ***The disclosures as to the nature of J.P. Morgan's relationship with Thoma Bravo***. The Proxy indicates at 31 that "Waterhouse and management informed the Board of their negotiations and discussions with  J.P. Morgan and the disclosures of J.P. Morgan as to the nature of its relationships with Thoma Bravo."  But at 50, the Proxy only provides the following about the nature of its relationship with Thoma Bravo:

> During the two years preceding the date of this letter, neither J.P. Morgan nor its affiliates have had any other material financial advisory or other material commercial or investment banking relationships with the Company, Parent, Merger Sub, Silver Lake or Thoma Bravo (Silver Lake, together with Thoma Bravo, the "Acquirors"). During the two years preceding the date of this letter, J.P. Morgan and its affiliates have provided financial advisory, equity and debt underwriting and bank financing services to portfolio companies of the Acquirors that are unrelated to the proposed Merger.

There is no disclosure of the specific "financial advisory, equity and debt underwriting and bank financing services to portfolio companies of the Acquirors."  This omission renders the Proxy materially misleading because shareholders are entitled to be informed of all factors that may

potentially incentivize the Board's financial advisors to subjectively manipulate their valuation of the Company to make the proposed consideration appear fair when it is not.  This information is especially material here because the investment bank will be paid $36 million only if the Proposed Acquisition is consummated, and all J.P. Morgan apparently did during the sales process was sit in at Board meetings, contact – at the Board's direction – some potential acquirers, and then offer a rubber-stamp fairness opinion.

71.     ***Whether or not the final set of projections used by J.P. Morgan in its fairness analyses was the same as the long-term standalone financial plan from September 9, 2015 or the management projections from the August 25, 2015 Board meeting***.  Disclosure of whether or not the final set of projections used by J.P. Morgan in its fairness opinion was the same as the long-term standalone financial plan from September 9, 2015 or the management projections from the August 25, 2015 Board meeting is important to understand how management changed assumptions over time.   The omission of this information renders the Proxy materially misleading because stockholders are entitled to be informed of management's best estimates of the Company's future cash flows, especially when the projections formed the basis for the fairness opinion offered by the Board's financial advisor.

72.     ***Whether J.P. Morgan treated stock-based compensation as a cash or non-cash expense***.  Certain advisors treat stock-based compensation ("SBC") as a cash expense, whereas others recognize that is not a cash expense and add it back into unlevered free cash flow so as to not reduce cash flows by a non-cash expense.  The treatment of SBC could have a material impact on cash flow valuations, given that SolarWinds' SBC was almost $40 million in the most recent fiscal year.

73.    ***The financial projections provided by SolarWinds management for fiscal years 2015-2020, as well as the extrapolated projections prepared by J.P. Morgan for fiscal years 2021-2024, for the following items that are not reported in the Proxy***:

(a)    Revenue (extrapolations for 2021 through 2024 only)

(b)    EBITDA (extrapolations for 2021 through 2024 only)

(c)    EBIT (or D&A) (extrapolations for 2021 through 2024 only)

(d)    Taxes (or tax rate)

(e)    Capital expenditures

(f)    Changes in net working capital

(g)    Stock-based compensation expense

(h)    Any other adjustments to unlevered free cash flow

(i)    Unlevered free cash flow (extrapolations for 2021-2024 only ***if*** the "Free Cash Flow" in the proxy is the same as the unlevered free cash flow used in the DCF).

74.    Projections, in particular extrapolated projections, are very important because they reflect the growth prospects of SolarWinds, which is relevant to understanding the context of J.P. Morgan's perpetuity growth rate assumptions and evaluating the results of the discounted cash flow analysis.  In a transaction where shareholders are going to be cashed out, shareholders must compare the upfront cash consideration offered with retaining their shares to participate in future cash flow. This calculus is impossible without knowing SolarWinds' expected long-term financial performance. As noted above, the omission of this information renders the Proxy materially misleading because stockholders are entitled to know management's best estimates of the Company's future cash flows, ***especially*** when the projections formed the basis for the fairness opinion offered by the Board's financial advisor.

75.     *Whether the Free Cash Flow line item on the disclosed Management Projections is the same as the unlevered Free Cash Flow used by J.P. Morgan to calculate its discounted cash flow analysis*.  Free Cash Flow can be defined many different ways, with resulting figures being materially different based on the precise definition.  As such, it is quite possible the Free Cash Flow line item on the disclosed Management Projections in the Proxy is not the same unlevered Free Cash Flow used by J.P. Morgan in its discounted cash flow analysis.  A difference between the two could result in a material impact on valuation should shareholders evaluate J.P. Morgan's work using a different set of projections.

76.     By agreeing to sell SolarWinds to Sponsors at an unfair price, defendants have breached their fiduciary duties of loyalty, due care, independence, good faith and fair dealing, and/or have aided and abetted such breaches by the Board.  As a result of the Board's breaches, the current Proposed Acquisition consideration of $60.10 for each SolarWinds share does not fairly value SolarWinds and its prospects.  SolarWinds stockholders stand to be deprived of the true value of their shares.

77.     Unless enjoined by this Court, defendants will complete the sale of SolarWinds to Sponsors, and plaintiff and the other SolarWinds stockholders will forever lose their equity interest in the Company for an inadequate price, all to the irreparable harm of plaintiff and the other stockholders of SolarWinds.  Plaintiff seeks to enjoin the Proposed Acquisition.

## COUNT I

### Claim for Breach of Fiduciary Duties
### Against the Individual Defendants

78.     Plaintiff repeats and realleges each allegation set forth herein.

79.     The Individual Defendants have violated fiduciary duties of care, loyalty, candor, good faith and independence owed to the public stockholders of SolarWinds and have acted to put their personal interests ahead of the interests of SolarWinds stockholders.

80.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are acting to unfairly deprive plaintiff and other members of the Class of the true value inherent in and arising from SolarWinds.

81.     By entering into the Proposed Acquisition without regard to the fairness of the transaction to the Company's stockholders, the Individual Defendants have knowingly and recklessly and in bad faith violated their fiduciary duties.

82.     As demonstrated by the allegations above, the Individual Defendants knowingly or recklessly failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the stockholders of SolarWinds because, among other reasons, they failed to:

      (a)     ensure a fair process;

      (b)     properly maximize the value of SolarWinds common stock;

      (c)     act in the best interest of SolarWinds stockholders; and

      (d)     guard against the numerous conflicts of interest presented by the Proposed Acquisition.

83.     Because the Individual Defendants dominate and control the business and corporate affairs of SolarWinds, and are in possession of private corporate information concerning SolarWinds' assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of SolarWinds that

makes it inherently unfair for the Individual Defendants to pursue the Proposed Acquisition at an unfair price, to the exclusion of maximizing stockholder value.

84.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the Class.

85.     As a result of the Individual Defendants' actions, plaintiff and the Class will be harmed.

86.     The Individual Defendants are engaging in self-dealing, are not acting in good faith toward plaintiff and the other members of the Class, and have breached and are breaching their fiduciary duties to the members of the Class.

## COUNT II

### Claim for Aiding and Abetting Breaches of Fiduciary Duty
### Against SolarWinds, Thoma Bravo, Silver Lake, Parent and Merger Sub

87.     Plaintiff repeats and realleges each allegation set forth herein.

88.     The Individual Defendants owe to plaintiff and the members of the Class certain fiduciary duties as fully set out herein.

89.     By committing the acts alleged herein, the Individual Defendants have breached and are breaching their fiduciary duties owed to plaintiff and the members of the Class.

90.     SolarWinds, Thoma Bravo, Silver Lake, Parent and Merger Sub are colluding in or aiding and abetting the Individual Defendants' breaches of fiduciary duties, and are active and knowing participants in the Individual Defendants' breaches of fiduciary duties owed to plaintiff and the members of the Class.

91.     Defendants SolarWinds, Thoma Bravo, Silver Lake, Parent and Merger Sub are participating in the breaches of the fiduciary duties by the Individual Defendants for the purpose of

advancing their own interests.  Defendants SolarWinds, Thoma Bravo, Silver Lake, Parent and Merger Sub will obtain both direct and indirect benefits from colluding in or aiding and abetting the Individual Defendants' breaches.

92.     Plaintiff and the other members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

### COUNT III

**Against the Individual Defendants and SolarWinds for Violations of §14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder**

93.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

94.     During the relevant period, the Individual Defendants and SolarWinds disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

95.     The Proxy was prepared, reviewed and/or disseminated by the Individual Defendants and SolarWinds.  It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Company's assets.

96.     In so doing, the Individual Defendants and SolarWinds made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder. By virtue of their positions within the Company, the Individual Defendants and SolarWinds were aware of this information and of their duty to disclose this information in the Proxy.

97.     The Individual Defendants and SolarWinds were at least negligent in filing the Proxy with these materially false and misleading statements and omissions.

98.     The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Acquisition.   In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

99.     By reason of the foregoing, the Individual Defendants and SolarWinds have violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

100.    Because of the false and misleading statements and/or omissions in the Proxy, plaintiff is threatened with irreparable harm, rendering money damages inadequate.   Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

### COUNT IV

**Against the Individual Defendants, Thoma Bravo and Silver Lake for
Violation of §20(a) of the 1934 Act**

101.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

102.    The Individual Defendants acted as controlling persons of SolarWinds within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of SolarWinds and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

103.     Each of the Individual Defendants, Thoma Bravo and Silver Lake was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

104.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Acquisition.  They were thus directly involved in the making of this document.

105.     Thoma Bravo and Silver Lake also had direct supervisory control over the composition of the Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy.

106.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants, Thoma Bravo and Silver Lake were each involved in negotiating, reviewing and approving the Proposed Acquisition.  The Proxy purports to describe the various issues and information that they reviewed and considered, descriptions which had input from the Individual Defendants, Thoma Bravo and Silver Lake.

107.     By virtue of the foregoing, the Individual Defendants, Thoma Bravo and Silver Lake have violated §20(a) of the 1934 Act.

108.     As set forth above, the Individual Defendants, Thoma Bravo and Silver Lake had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as

controlling persons, these defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, SolarWinds' shareholders will be irreparably harmed.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, as follows:

A.      Declaring that this action is properly maintainable as a class action;

B.      Declaring and decreeing that the Proposed Acquisition was entered into in breach of the fiduciary duties of the defendants and is therefore unlawful and unenforceable;

C.      Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until the Company adopts and implements a procedure or process to obtain the highest possible price for stockholders;

D.      Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of SolarWinds stockholders;

E.      Declaring that the Proxy contains false and misleading statements in violation of federal law, and directing defendants to provide SolarWinds shareholders with all material information necessary to make a fully informed vote on the Proposed Acquisition;

F.      Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof;

G.      Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

H.      Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

DATED:  December 28, 2015          BOULETTE GOLDEN & MARIN L.L.P.


*/s/ Michael D. Marin*
_____

MICHAEL D. MARIN

Michael D. Marin
State Bar No. (00791174)
2801 Vía Fortuna, Suite 530
Austin, TX  78746
Telephone:  512/732-8900
512/732-8905 (fax)
mmarin@boulettegolden.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
Randall J. Baron
David T. Wissbroecker
Edward M. Gergosian
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

LAW OFFICES OF MARC S. HENZEL
Marc S. Henzel
230 Old Lancaster Road, Suite B
Merion Station, PA  19066
Telephone:  610/660-8000
610/660-8080 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

JOHN THOMAS MOORE ROLLOVER IRA ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: plaintiff holds 400 shares of SolarWinds stock.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23 day of DECEMBER , 2015.

_John Thomas Moore_

JOHN THOMAS MOORE ROLLOVER
IRA

SOLARWINDS